J-A09022-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILLIAM BENJAMIN DAVIS | : | No. 1119 WDA 2024 |

Appeal from the Suppression Order Entered August 20, 2024
In the Court of Common Pleas of Fayette County Criminal Division at
No(s): CP-26-CR-0000565-2024

BEFORE: KUNSELMAN, J., NICHOLS, J., and LANE, J.

MEMORANDUM BY KUNSELMAN, J.: **FILED: December 22, 2025**

The Commonwealth appeals from the order granting William Benjamin Davis' motions to suppress the evidence gathered in connection with a traffic stop and for a pretrial writ of habeas corpus. We agree with the Commonwealth that the initial stop of Davis' vehicle was valid. However, the record supports Davis' alternative argument that the police unreasonably prolonged the stop. Furthermore, a pretrial writ of habeas corpus is not an appropriate remedy for illegally obtained evidence. Therefore, we reverse the suppression of evidence from the initial stop, affirm the suppression of evidence obtained after the stop was unlawfully prolonged, and reverse the grant of a pretrial writ of habeas corpus.

## I. Factual and Procedural History

In the early hours of February 14, 2024, Pennsylvania State Police Trooper James Tyler conducted a traffic stop of the vehicle Davis was driving.

He arrested Davis and charged him with possession with intent to deliver, driving an unregistered vehicle, obscured plate, and duty of operator.[1]

Davis exercised his right to a preliminary hearing on March 19, 2024. At the preliminary hearing, Trooper Tyler testified that he was conducting routine patrol when he saw Davis driving a silver Dodge Caravan. Trooper Tyler explained that he started following the Caravan because Davis reacted to seeing the police:

> As I was sitting stationary, I observed [Davis], he passed by my stationary position. As I observed him, he was sitting behind the B pillar. Upon the observation of my marked vehicle, he re-positioned himself, sat up and then went ten and two on the steering wheel, the death grip, and proceeded to look at my marked patrol unit.

N.T., 3/19/24, at 5. Trooper Tyler testified that once he got behind Davis' vehicle, he ran its Maryland registration number and saw that the registration was suspended. Additionally, Trooper Tyler stated that the vehicle had a plate cover that covered the word "Maryland" on the plate.

Trooper Tyler explained that *after* he saw the plate cover and received a report that the registration was suspended, he activated his lights and sirens to conduct a traffic stop. Once Davis stopped, Trooper Tyler and Trooper Luke Martin spoke with Davis, who provided a valid Arizona driver's license. The officers asked Davis to show a valid insurance card; while they were waiting for Davis to obtain the insurance card, they directed Davis to step outside of

_____

[1] 35 P.S. § 780-113(a)(30), 75 Pa.C.S. §§ 1301(a), 1332(b)(4), and 6308(a), respectively.

the vehicle. Eventually, Davis provided a screenshot of the insurance information while he was standing at the front of the police vehicle.

At the preliminary hearing, Trooper Tyler stated that Davis' answers to the police questioning created suspicion. Davis was not able to provide his intended destination to either officer, although he tried to show Trooper Martin on his GPS unit and told Trooper Tyler he was staying with his cousin for one to two days. Additionally, Trooper Tyler noted that he saw two cardboard boxes in the vehicle but no luggage. Trooper Tyler stated that Davis was "extremely nervous," cracking his voice, fidgeting, and asking the reason for all the questions. After Davis refused consent to search the vehicle, approximately 17 minutes into the stop, Trooper Tyler contacted a K-9 Corporal, Christina Martz, for assistance for "a host of reasons."

> One of the reasons was [Davis'] short duration of time as far as the route he was taking, he wasn't aware of . . . how long he was traveling in order to get to his destination. He wasn't aware or wouldn't even communicate his destination to me. When I asked him where he was going, he said it was, I am going . . . 58 minutes from where we are right now. He communicated that he was going to see his cousin who he hasn't seen in a long time to which there was no luggage in the vehicle or anything resembling that he was visiting anywhere. Again with his nervous response to just my overall simple questions. And when I asked him . . . to exit the vehicle and when I was asking him about any contraband that might have been within the vehicle, just the nervous responses he had throughout the traffic stop.

*Id.* at 13–14.

Trooper Tyler testified that Davis waited on the police vehicle push bar for "about an hour and a half" until Corporal Martz arrived. Corporal Martz

- 3 -

deployed the State Police Drug Detection K-9, which alerted to the vehicle. Police detained Davis and obtained a search warrant. The vehicle contained almost five kilograms of cocaine.

Trooper Tyler indicated that there was a motor vehicle recording of the entire traffic stop. At the time of the preliminary hearing, he stated that he requested it but had not yet received a physical copy. Davis did not present any testimony. After the preliminary hearing, all charges were held for court.

Davis filed an omnibus pretrial motion on May 16, 2024, including a suppression motion and a *habeas corpus* petition. In his suppression motion, Davis challenged both the initial stop and the continuation of the stop.

The case proceeded to a suppression hearing on June 12, 2024. Neither party presented witness testimony. Instead, the Commonwealth indicated it would introduce Davis' preliminary hearing transcript and a video of the stop "so that the court can view it as additional facts." N.T., 6/12/24, at 3. The Commonwealth did not have a copy of the video at the suppression hearing, so the suppression court "figuratively" marked the video as Exhibit 1 and received it into evidence.[2] *Id.* Davis effectively agreed that the record, *i.e.*, the transcript and the video, would be sufficient to resolve his motion:

> THE COURT: And there was no need after you reviewed the [preliminary hearing] transcript for you to supplement [your omnibus] motion in any[ ]way?

---

[2] Nearly five months later, the Clerk of Courts indicated that Exhibit 1 was turned over for filing purposes. Exhibit Receipt, 11/8/24.

[Davis' counsel]: You know, certainly there are possibly questions that I'll have for the Trooper. But he's not here. I think that everything was kind of answered here.

THE COURT: [It w]ould be contained in the viewing of it and in the transcript.

[Davis' counsel]: Correct.

*Id.* at 4.

Based on this record, the parties then argued the issues Davis included in his suppression motion: the legality of the traffic stop, and the legality of Davis' prolonged detention. *Cf.* Omnibus Pre-Trial Motion, 5/16/24, at ¶ 26, a–g. Davis, relying on his notes of the video, argued that the police stopped him without justification and illegally prolonged the stop. N.T., 6/12/24, at 5–13. The Commonwealth first argued that the police had authority to conduct the stop to address the partially obstructed license plate and to investigate the vehicle's registration. *Id.* at 16. The prosecutor, aware that Davis also challenged the continuation of the stop, summarized Trooper Tyler's observations and argued about the circumstances of the delay:

[The Assistant District Attorney]: And then you pull someone over and [ask] "where are you going?" "About an hour away, here's my GPS." Even [defense counsel's] argument said "Hey I'm going [to see] someone in Clearfield County. I don't know exactly where." We don't even have that here. "Oh, I'm going to my cousin's house who I haven't seen in a long[ ]time. It's 2 a.m. and I am about an hour away. And here, here is where the address is." I mean you don't have any idea? Is it the North Hills of Pittsburgh? Is it somewhere in Greene County? Is it somewhere in Westmoreland County? There was no testimony [at the preliminary hearing] that there was any indication at all or where this supposed cousin lives. And then the trooper also testified . . . that there was no luggage, there is no evidence anywhere when [Trooper Tyler] is looking in from the exterior that [Davis] was going to stay anywhere or any indication that would

- 5 -

back up . . . the story that he was giving to the officers on that night.

And as for the detention, . . . the stop occurs at approximately 1:50 a.m. At approximately 2:07 a.m. is when the trooper calls and says I would like to get another trooper here with a drug dog. So it was not . . . "we are going to detain you for an hour and a half and then we are going to do this." [Trooper Tyler] made that call fairly quickly after that initial stop. Where that officer is dispatched from, [it's] unfortunate that [Davis] had to wait, but I don't know if that was because of any delay or anything that the trooper himself did to prolong this.

*Id.* at 16–17 (paragraph break and some quotation marks added).

The suppression court announced that it would take the issue under advisement and might require briefing. Ultimately, the court did not direct the parties to brief the issue after the suppression hearing. Rather, on August 14, 2024, it granted Davis' motions for suppression and for a pretrial writ of *habeas corpus*. The suppression court reasoned that Davis' repositioning himself when he saw the police vehicle did not "rise[] to any level of suspicion" to support the ensuing traffic stop. Although the court acknowledged that Trooper Tyler subsequently saw an obstructive license plate frame and received a report that the vehicle's registration was suspended, "these observations were not found until the Trooper relied upon his suspicions" to follow Davis.[3] Because the suppression court suppressed all evidence as the "fruit of the poisonous tree," it concluded that the Commonwealth would be unable to make a *prima facie* case of Davis' guilt for habeas corpus purposes.

---

[3] The suppression court later opined that the license plate frame did not violate subsection 1332(b)(4) of the Vehicle Code and therefore did not provide probable cause for a stop. Suppression Court Opinion, 11/8/24, at 3 (citing the applicable rule of construction in 75 Pa.C.S. § 1332(b.1)).

- 6 -

The Commonwealth timely appealed. The Commonwealth and the suppression court complied with Pennsylvania Rule of Appellate Procedure 1925.

The Commonwealth presents three issues for review:

Did the suppression court err in concluding that the trooper lacked probable cause to conduct a traffic stop based on the trooper's observation of alleged suspicious activity when the trooper did not effectuate said stop until observing two (2) clear violations of the [] Vehicle Code, and in light of the Superior Court's holding in **Commonwealth v. Harris**, 176 A.3d 1009 (Pa. Super. 2017) (citing **Whren v. U.S.**, 517 U.S. 806 (1996)), that "any violation of the [] Vehicle Code legitimizes a stop, even if the stop is merely a pretext for an investigation of some other crime"?

Did the suppression court err in concluding that the trooper lacked probable cause to conduct a traffic stop when the trooper testified that after observing [Davis'] "suspicious activity" but prior to initiating said traffic stop, he observed [Davis] in commission of two (2) alleged violations of the [] Vehicle Code; specifically, an obstructed registration plate in violation of 75 Pa.C.S. § 1332(b)(4) and a suspended vehicle registration in violation of 75 Pa.C.S. § 1301(a)?

Did the suppression court err in granting [Davis'] Motion for Writ of Habeas Corpus when the evidence against him was discovered as a result of a valid traffic stop based upon probable cause of two (2) separate motor vehicle violations, and not "fruit of the poisonous tree" as stated in the Court's Opinion and Order?

**See** Commonwealth's Brief at 4.

The Commonwealth argues that Trooper Tyler had a constitutionally valid reason to stop Davis, *i.e.*, seeing the obscured license plate and receiving a report that the vehicle's registration was suspended. Because the initial stop was permissible, it submits, the cocaine discovered in the ensuing

investigation did not stem from any illegality, and the suppression court erred in granting Davis' motions.

Davis agrees with the suppression court's rationale that the initial stop was invalid and any evidence obtained from the search was fruit of the poisonous tree.[4]  Alternatively, Davis argues the troopers extended the stop without a legally sufficient basis to do so.

We first address the Commonwealth's claim that the suppression court improperly ruled the vehicle stop to be unconstitutional.  We then address Davis' alternative argument that the stop was unconstitutionally prolonged. Finally, we address the pretrial writ of habeas corpus.

## II.   Scope and Standard of Review

The scope of appellate review over a Commonwealth appeal from an order granting suppression is "only the evidence produced at the suppression hearing," limited to evidence from any defense witnesses, plus any evidence from the Commonwealth "which remains uncontradicted."  *Commonwealth v. Carver*, 318 A.3d 386, 389 (Pa. Super. 2024) (citing *Commonwealth v. Barr*, 266 A.3d 25, 29 (Pa. 2021)).  If the defense presented no evidence and left the Commonwealth's evidence "uncontested and uncontradicted," then we review the undisputed facts established in the record.  *See Commonwealth v. Worthy*, 957 A.2d 720, 724 (Pa. 2008).

---

[4] "[A]n appellate brief is simply not an appropriate vehicle for the incorporation by reference of matter appearing in previously filed legal documents." *Commonwealth v. Rodgers*, 605 A.2d 1228, 1239 (Pa. Super. 1992).  We remind counsel to set forth an argument in full.

Our standard of review requires us to consider the suppression court's factual findings and legal conclusions. We first determine whether the record supports the court's findings of fact, mindful that "the suppression court, as fact-finder, has the exclusive ability to pass on the credibility of witnesses." *Carver*, 318 A.3d at 389–90 (citing *Commonwealth v. Fudge*, 213 A.3d 321, 326 (Pa. Super. 2019)). If the record supports the suppression court's factual findings, then those facts bind us. *Commonwealth v. Lissmore*, 313 A.3d 1050, 1056 (Pa. Super. 2024). However, we may reject factual findings that are "unsupported by the evidence" from the suppression hearing. *Commonwealth v. J. Miller*, 56 A.3d 424, 428 (Pa. Super. 2012). Likewise, if there is "a gap in the suppression court's findings" of fact, we fill the gap with the appellee's evidence from the hearing and any uncontradicted evidence from the appellant. *Commonwealth v. A. Miller*, 333 A.3d 470, 476 (Pa. Super. 2025).

We review the suppression court's conclusions of law *de novo* and determine the correct application of law to the facts. *See Carver*, 318 A.3d at 390 (citing *Commonwealth v. Brown*, 996 A.2d 473, 376 (Pa. 2010)). When there are no relevant facts in dispute, the only issues for review are pure questions of law. *Worthy*, 957 A.2d at 724. Notably, we may affirm an order suppressing evidence "for any reason supported by the record." *Commonwealth v. Seeney*, 316 A.3d 645, 648 (Pa. Super. 2024) (citing *Commonwealth v. Hamlett*, 234 A.3d 486, 488 (Pa. 2020)).

- 9 -

### III. The Initial Stop Was Valid

Motor vehicle stops are protected by the Federal and Pennsylvania constitutional prohibitions against unreasonable searches and seizures. *See Commonwealth v. Chase*, 960 A.2d 108, 118 (Pa. 2008). Merely following a car without initiating a stop is not a seizure. Similarly, police do not require any level of suspicion to check a license plate number. *Commonwealth v. Bolton*, 831 A.2d 734, 737 (Pa. Super. 2003); *see also Commonwealth v. Watkins*, 304 A.3d 364, 371 (Pa. Super. 2023), *appeal denied*, 326 A.3d 811 (Pa. 2024) (holding a driver had no expectation of privacy in his license plate number). However, when police initiate a traffic stop, our law requires reasonable suspicion of a Vehicle Code violation that requires investigation (or probable cause that the driver committed a non-investigable offense) "at the moment of the stop." *Commonwealth v. Muhammed*, 992 A.2d 897, 900 (Pa. Super. 2010) (quoting *Commonwealth v. Basinger*, 982 A.2d 121, 125 (Pa. Super. 2009)) (brackets omitted). Notably, police may stop a vehicle after establishing the requisite quantum of cause for any such offense, even a minor violation. *Harris*, 176 A.3d at 1020 (following the "bright-line rule that any technical violation of a traffic code legitimizes a stop" from *Whren*, 517 U.S. at 812–13).

Here, the suppression court found the following facts about Trooper Tyler's stop of the vehicle Davis was driving:

> In the instant case, the initial reason presented by Trooper Tyler for **stopping** [Davis] was his observation of [Davis] re-positioning himself. Specifically, [Davis] "...sat up and went to

- 10 -

ten (10) and two (2) on the steering wheel." Trooper Tyler described this as a "death grip." He also observed that [Davis] "looked at" the marked patrol unit.

Opinion, 8/14/24, at 2 (emphasis added); *accord* Opinion, 11/8/24, at 2.

The record does not support this finding. Although the troopers began to **follow** Davis because he changed his posture, they did not **stop** him until they saw two potential violations of the Vehicle Code. By the time Trooper Tyler initiated the traffic stop, he saw a license plate frame that obstructed the state name on the Maryland license plate, and he received a report that the vehicle's registration was suspended. Because the police did not need any reason to follow Davis, their observations while following him were not "fruit of the poisonous tree." Suppression Court Opinion, 8/14/24, at 3. Rather, they were potential violations of the Vehicle Code, which permitted Trooper Tyler to initiate a traffic stop.[5] **Chase**, 960 A.2d at 120 (citing, *inter alia*, **United States v. Miguel**, 368 F.3d 1150, 1153–54 (9th Cir. 2004) (upholding a traffic stop based on a computer database's inaccurate report that the vehicle's registration was expired)). Therefore, the initial stop was valid.

---

[5] It is unclear if the suppression court's ruling that the license plate frame was legal was a finding of fact (which binds us if supported by the record) or a conclusion of law (which we review *de novo*). We observe that the statutory rule of construction permits frames that allow law enforcement or automated systems to identify the plate number and issuing jurisdiction. 75 Pa.C.S. § 1332(b.1). There was no evidence here that an automated system could identify the state on this license plate. Regardless, the potential suspended registration provided reasonable suspicion to allow the police to stop Davis.

## IV. The Troopers Unlawfully Prolonged the Stop

As noted above, this Court may affirm an order suppressing evidence for a reason other than the rationale of the suppression court. *Seeney*, 316 A.3d at 648. The "right for any reason" doctrine allows an appellate court to affirm the order under review "on any basis that is supported by the record." *In re A.J.R.-H.*, 188 A.3d 1157, 1175–76 (Pa. 2018) (citing *Ario v. Ingram Micro, Inc.*, 965 A.2d 1194, 1200 (Pa. 2008)). We may thereby affirm an order "if the established facts support a legal conclusion producing the same outcome." *Id.* at 1176. However, we cannot invoke the "right for any reason" doctrine if we "must weigh evidence and engage in fact finding or make credibility determinations to reach a legal conclusion." *Id.*

Here, the facts are established. Although the suppression court did not provide any factual findings after Davis pulled over, we rely on the facts from the uncontradicted evidence from the hearing. *Miller*, 333 A.3d at 476. Because Davis did not contest or contradict any of the evidence provided by the Commonwealth, there are no relevant facts in dispute, and the issue is purely one of law. *Worthy*, 957 A.2d at 724. Notably, without live testimony at the suppression hearing, there was no credibility to assess from either the video or the preliminary hearing transcript.[6] Thus, we are not usurping the suppression court's role as the judge of credibility. Both Davis and the Commonwealth argued to the suppression court about the issue Davis now

---

[6] The judge presiding over the suppression hearing was not the magisterial district judge who presided over the preliminary hearing.

presents. We thus analyze the established facts to determine if the Commonwealth proved that the police had reasonable suspicion to detain Davis after verifying the insurance of the vehicle he was driving.

This Court recently explained that the United States and Pennsylvania Constitutions prohibit police from prolonging a traffic stop beyond the time needed to address the violations that led to the stop. **Commonwealth v. Brinson**, 328 A.3d 1096, 1104–05 (Pa. Super. 2024) (citing, *inter alia*, **Rodriguez v. United States**, 575 U.S. 348 (2015)).

> [T]he duration of police inquiries during a traffic stop is determined by the seizure's "mission" to address the traffic violation that warranted the stop, and to attend to related safety concerns. When a stop lasts longer than is necessary to complete its mission, it becomes unlawful. The critical question is not whether the inquiry occurs before or after the issuance of a ticket, but whether it prolongs or adds time to the stop. While, for their own safety, officers may order drivers to exit the vehicle or ask whether a detainee has a weapon, not all inquiries are incident to the stop's mission.

**Id.** (citations and quotation marks omitted).

By contrast, there is no constitutional impediment to prolonging a traffic stop if police develop reasonable suspicion of a separate offense "before the initial stop's purpose had been fulfilled." **Commonwealth v. Sloan**, 303 A.3d 155, 163 (Pa. Super. 2023) (quoting **Commonwealth v. Harris**, 176 A.3d 1009, 1020 (Pa. Super. 2017)). In such cases, police may detain the driver to investigate the new suspicions. **Id.** Whether an officer has reasonable suspicion of a new crime depends on the totality of the circumstances, which depends in part on the officer's experience:

To establish grounds for reasonable suspicion, the officer must articulate specific observations which, in conjunction with reasonable inferences derived from these observations, led him reasonably to conclude, **in light of his experience**, that criminal activity was afoot and the person he stopped was involved in that activity.

In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight to **the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience**. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Id.* at 164 (quoting *Commonwealth v. Smith*, 917 A.2d 848, 852 (Pa. Super. 2007)) (quotes, ellipses, and brackets omitted; emphasis added).

In *Brinson*, a police officer stopped a vehicle for running a stop sign. 328 A.3d at 1101. While the officer obtained the driver's documentation, he noticed that both the driver and passenger were nervous. *Id.* The officer had prior experience with the passenger. *Id.* The driver said he was going to a barbecue, denied that he was nervous, and refused consent to search the car. *Id.* The officer requested a drug-sniffing dog approximately 10 to 15 minutes into the traffic stop, entailing a 20-to-30-minute delay. *Id.* While waiting, the passenger asked to retrieve a hoodie from the car, and the officer smelled marijuana. *Id.* The dog indicated, and a subsequent car search yielded a gun and drugs. *Id.* at 1102. The driver and passenger were charged.

The suppression court in *Brinson* granted the defendants' suppression motion, and we affirmed. Notably, we considered only the factors that arose

before the traffic stop "reasonably should have been concluded." *Id.* at 1105 (quoting the suppression court opinion). Because the officer provided no factors other than the driver and passenger being nervous, he did not have "reasonable suspicion to extend the stop and request a K-9 unit." *Id.* at 1106.

Here, the troopers validly stopped Davis and continued to keep him until they resolved the issue with the registration of the vehicle he was driving. This occurred when Davis showed the troopers the screenshot on his phone. In the video of the stop, Trooper Tyler told Davis, "If you get the insurance then we're square." Once Davis provided the screenshot of the insurance, the "mission" of the stop was complete, and the troopers could not detain Davis without reasonable suspicion of a new offense. *Brinson*, 328 A.3d at 1104–05. Trooper Tyler provided at the preliminary hearing:

- When Davis saw the police vehicle, he sat up straight, tightly gripped the steering wheel, and looked at the patrol unit.

- Davis had an Arizona driver's license. The vehicle was registered to someone else.

- The vehicle contained two cardboard boxes but no luggage.

- Davis was unable to provide a destination where he was traveling but instead showed his GPS unit, which said he was 58 minutes away.

- Davis said he was visiting his cousin for one to two days.

- Davis was nervous.

Notably, Trooper Tyler testified at the preliminary hearing that he has been employed with the Pennsylvania State Police for almost five years. However, he never described his experience in investigating drug trafficking

or provided a reason why any of the above factors would indicate that criminal activity was afoot. While such evidence might not be relevant at a preliminary hearing, it is an important part of the totality of the circumstances test to determine whether the officer could reasonably infer criminal activity based on his observations.

At a suppression hearing, the Commonwealth has the burden to prove that the challenged evidence was not obtained in violation of the defendant's rights. Pa.R.Crim.P. 581(H). Here, the Commonwealth was aware of Davis' challenges, including the legality of prolonging the stop. The only evidence at the suppression hearing was the preliminary hearing transcript and the video. Because the record does not contain essential evidence of the necessary inferences to establish reasonable suspicion to prolong the stop, it supports the suppression of any evidence obtained after the stop was unconstitutionally prolonged. We therefore affirm this portion of the suppression order.

### V. A Pretrial Writ of Habeas Corpus Was Improper

The suppression court granted Davis' pretrial motion for a writ of habeas corpus because, after the evidence was suppressed, the Commonwealth would be unable to make a *prima facie* showing of Davis' guilt. The parties devote scant briefing to this distinct issue.

We exercise plenary review over a ruling on a pretrial habeas corpus motion. *Commonwealth v. Dantzler*, 135 A.3d 1109, 1112 (Pa. Super. 2016) (*en banc*). Notably, "the remedy for illegally obtained evidence is suppression of the evidence and its exclusion at trial, not dismissal of the

case." ***Commonwealth v. Keller***, 823 A.2d 1004, 1011–12 & n.5 (Pa. Super. 2003), *abrogated on standard of review grounds by* ***Dantzler***, 135 A.3d at 1112. Thus, the evidence from the preliminary hearing established a *prima facie* case of Davis' guilt regardless of the suppression ruling. We therefore reverse the suppression court's grant of a pretrial writ of habeas corpus.

## VI. Conclusion

We reverse the suppression of evidence obtained before the "mission" of the initial stop was complete, *i.e.*, before Davis provided the screenshot of the car insurance. We affirm the suppression of evidence obtained afterwards. We reverse the pretrial writ of habeas corpus.

Order reversed in part and affirmed in part. Case remanded. Jurisdiction relinquished.

Judge Lane joins; Judge Nichols notes dissent.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/22/2025